**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

GERBER SCIENTIFIC INTERNATIONAL,
INC.,                                          :
                Plaintiff,              :
                              :
                v.                    :      Civ. No. 3:07CV1382 (PCD)
                              :
SATISLOH AG and
SATISLOH NORTH AMERICA, INC.,       :
                Defendants.          :

## RULING ON DEFENDANTS' MOTION TO DISMISS

Plaintiff Gerber Scientific International, Inc. ("Gerber") brings this complaint for patent infringement of U.S. Patent No. 5,485,771 ("'771 patent"). On May 28, 2009, the Court denied Defendants Satisloh AG and Satisloh North America, Inc.'s (collectively, "Satisloh") Motion for Summary Judgment on Invalidity for Indefiniteness. On June 19, 2009, Defendants moved pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss Plaintiff's complaint [Doc. No. 88], alleging that Gerber does not own the '771 patent and therefore lacks standing. For the following reasons, this motion is **denied.**

## I.      BACKGROUND

Gerber alleges infringement of U.S. Patent No. 5,485,771, which is directed to an ophthalmic lens generating machine. Gerber alleges that Satisloh has infringed the '771 patent by producing, importing, using, and selling infringing ophthalmic lens generator products without authority or license from Gerber. (Compl. ¶ 11.) Defendants, however, submit that they recently discovered breaks in the chain of Plaintiff's claimed title to the '711 patent and Plaintiff therefore lacks standing to pursue a claim for infringement.

The '771 patent issued from U.S. Patent Application Ser. No. 08/038,350 ("350

application), filed March 19, 1993.  (Defs.' Mem. in Support of M. to Dismiss at 8.)  The '350 application was the third in a series of related patent applications.  The '350 was a continuation-in-part of application Ser. No. 08/011,835 ("835 application") filed February 2, 1993, which is now abandoned.  The '835 application was a continuation of application Ser. No. 07/766,394 ("394 application") filed September 27, 1991, also abandoned. (Defs.' Ex. K, '771 Patent at col.1 ln. 5-10.)

The '394 application was abandoned after a rejection of its claims. (Defs.' Ex. M, Notice of Abandonment.)  The '835 application was abandoned after the inventors filed the '350 continuation in part, from which the '771 patent issued.  (Defs.' Ex. N, Notice of Abandonment.) A continuation-in-part ("CIP") is a related application, "filed during the lifetime of an earlier nonprovisional application, repeating some substantial portion or all of the earlier nonprovisional application and adding matter not disclosed in the said earlier nonprovisional application." (Manuel of Patent Examining Procedure § 201.8.)

On December 2, 1991, the inventors assigned the '394 application "and all divisions, continuations, and continuations-in-part of said application, and reissues and extensions of said Letters Patent or Patents" to Pilkington Visioncare, Inc. ("Pilkington").  (Defs.' Ex. C, Inventors to Pilkington Assignment.)

On March 9, 1992, Pilkington assigned the '394 application, along with 27 issued patents and 12 other pending applications to Coburn Optical Industries ("Coburn").  The assignment transferred "all its right, tittle and interest in, to and under said Letters Patent and patent applications and the inventions covered thereby and any divisions, reissues, continuations and extensions thereof." (Defs.' Ex. O, Pilkington to Coburn Assignment.)  This agreement was

pursuant to Coburn's acquisition of the Coburn Industries Optical Division of Pilkington. (Pl.'s Mem. in Opp. to M. to Dismiss at 4.)  Plaintiff submits that the Pilkington to Coburn assignment is part of its chain of title to the '771 Patent.  Defendants argue, however, that because the assignment does not specifically list "continuations in part" it does not include the '350 CIP application, which resulted in the '771 patent at issue.

Also on March 9, 1992, Coburn executed a Patent Collateral Assignment to J.P. Morgan Delaware ("J.P. Morgan").  J.P. Morgan, as lender, and Coburn, as assignor, executed an agreement whereby J.P. Morgan extended a $20,000,000 line of credit to Coburn.  In turn, Coburn assigned certain patent rights to J.P. Morgan as collateral. (Defs.' Ex. B, Patent Collateral Assignment at 1.)  Coburn maintained an exclusive license on all such patents. (Id. ¶ 8.)  The assignment further stated: "at such time as assignor shall completely satisfy all of the obligations and the Security Agreement terminates in accordance with Section 7.1 thereof, then this Assignment shall terminate and Lender, at Assignor's expense, shall execute and deliver to Assignor all deeds, assignments and other instruments as may be necessary or appropriate to re-vest in Assignor full title to the interest then held by Lender in the Patents." (Id. ¶ 9.)

Defendants argue that J.P. Morgan currently holds title to the '771 patent pursuant to this agreement.  Plaintiff counters that it fulfilled the obligations under the security agreement and the Patent Collateral Assignment consequently terminated.  J.P. Morgan confirms that their security interest in the patents as collateral terminated no later than July 8, 1997, as did all claims of J.P. Morgan to the '771 patent. (Pl.'s Ex. A, Farquhar Dec. at ¶¶ 3-4.)

On April 27, 1993, after the '350 application which resulted in the '771 patent was filed, the inventors executed a separate assignment, transferring this CIP to Coburn. (Defs.' Ex. A,

Inventors to Coburn Assignment.)  The assignment was recorded with the United States Patent and Trademark Office.  Defendants argue that this assignment is a nullity, as inventors had already assigned any CIP of the '834 application to Pilkington.  Plaintiff responds that this assignment was necessary to afford Coburn title to subject matter in the '350 CIP that differed from the subject matter of the original '394 application.

Plaintiff traces its ownership of the '771 patent from the above assignments through a series of mergers between Coburn and the present day Plaintiff.  On February 27, 1998, Plaintiff concluded a Stock Purchase Agreement with Coburn, which listed the '771 patent as a Coburn asset.  On April 30, 1998, Gerber Optical, Inc. merged with Coburn Optical, Inc.  (Pl.'s Ex. B, Gricks Dec. ¶ 3.)  Finally, on October 31, 2003, Gerber Coburn Optical, Inc. merged into Gerber Scientific International, Inc. (Pl.'s Ex. D.)

## II.    STANDARD OF REVIEW

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. See Fed. R. Civ. P. 12(b)(1).  Plaintiff, as the party asserting subject matter jurisdiction, has the burden of establishing by a preponderance of the evidence that it exists, Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996).  In analyzing a motion to dismiss pursuant to Rule 12(b)(1), the Court must "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations."  Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994).  However, "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." Atlantic Mutual Ins. Co. v. Balfour MacLaine Int'l, 968 F.2d 196, 198 (2d Cir. 1992); see also Robinson, 21 F.3d at 507.

Unlike with a Rule 12(b)(6) motion, a court resolving a Rule 12(b)(1) motion for lack of subject matter jurisdiction may refer to evidence outside the pleadings. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)); see also Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000) (in resolving a Rule 12(b)(1) motion, district courts may "resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing").

## III.    DISCUSSION

Defendants argue that Plaintiff lacks standing to bring suit for infringement of the '771 patent.  If Defendants are correct, this Court would lack subject matter jurisdiction.  As Plaintiff is the party asserting standing, it bears the burden of proof on this issue.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).  "The Federal Circuit has explained that 'to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit.'" Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc., 531 F. Supp. 2d 282, 283 (D. Conn. 2008) (quoting Paradise Creations, Inc. v. UV Sales, Inc., 315 F.3d 1304, 1309 (Fed. Cir. 2003)).

The face of the patent lists Coburn as the assignee.  Defendant does not dispute that Coburn merged with Gerber to become the named Plaintiff.  Therefore, if Coburn was the true patent owner, Plaintiff would have standing.  However, the assignation on the face of the patent is "not a conclusive indication" of patent ownership.  U.S. Philips Corp. v. Iwasaki Elec. Co., 505 F.3d 1371, 1375 (Fed. Cir. 2007).  Plaintiff must trace its chain of title from the original owner and creator to itself. Gaia Techs. v. Reconversion Techs., 93 F.3d 774, 777 (Fed. Cir.

1996).

**A. Pilkington to Coburn Assignment**

Plaintiff traces its title to the '771 patent from the inventors to Pilkington to Coburn to Gerber.  Defendants challenge the Pilkington to Coburn assignment, arguing that the '350 application was not included in the 1992 agreement.  Defendants argue that Pilkington did not transfer ownership of future CIPs of the '394 application along with the '394 application itself.  According to Defendants, Plaintiff therefore cannot trace its title to the '771 patent through Coburn.

On March 9, 1992, Pilkington assigned the pending '394 application along with 27 issued patents and 12 other pending applications to Coburn.  The assignment transferred "all its right, title and interest in, to and under said Letters Patent and patent applications and the inventions covered thereby and any divisions, reissues, continuations and extensions thereof." (Defs.' Ex. O, Pilkington to Coburn assignment.)  The assignment, however, does not use the term "continuations in part."[1]

The issue at hand is whether the specific term "continuations in part" was necessary to transfer title of the future '350 application and resulting '771 patent from Pilkington to Coburn. Defendants place great reliance on Univ. W. VA v. Vanvoorhies, 278 F.3d 1288, 1297 (Fed. Cir. 2002), where the Federal Circuit held that an inventor was obligated to assign CIPs because an agreement expressly used the term "continuation in part."  However, Defendants' reliance on Vanvoorhies is misplaced.  In Vanvoorhies, defendant was required to assign a CIP application to plaintiff as the signed patent policy specifically included "continuations in part." Id.  The

---

[1]In contrast, the inventors to Pilkington assignment specifically transferred title to both "continuations" and "continuations-in-part."  (Defs.' Ex. C, Inventors to Pilkington Assignment.)

Federal Circuit did not hold that a contract must use the exact words "continuations in part" in order for future CIPs to be included in an assignment.  The Court merely made the logical conclusion that if those words are used, then inventors must assign any and all CIPs.  It did not extend its holding to require the words "continuation in part" in a larger assignment that includes CIPs.

In fact, courts have found broadly worded contracts and assignments to include future CIPs, even without use of the term "continuation in part."  In Rowe Int'l Corp. v. Ecast, Inc., 500 F. Supp. 2d 887, 890 (N.D.I.L. 2007), the court held that although the term was not used, an assignment transferred rights to a CIP because it included "improvements" and "any and all other applications."  Similarly, the Federal Circuit held that a patent policy containing broad language was "more than sufficient" to require inventors to assign CIP applications.  Regents of the Univ. of New Mexico v. Knight, 321 F.3d 1111, 1120 (Fed. Cir. 2003) (the patent policy covered "all divisions, continuations, substitutions, renewal, and reissue applications").

Although Federal Circuit law governs patent issues before the Court, state law governs interpretation of the assignment contract.  Rowe, 500 F. Supp. at 890.  The objective of contract interpretation is to give effect to the expressed intentions of the parties.  Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir 1985).  As the cases above illustrate, an intent to assign CIPs can be expressed in several ways.  The Pilkington to Coburn assignment is broad, transferring "all rights title and interest in" 27 patents and 13 pending patent applications. (Defs.' Ex. O, Pilkington to Coburn Assignment.)  The rights, title, and interest in an application logically include any CIP of such application.  E.I. Du Pont de Nemours & Co. v. Okuley, 2000 U.S. Dist. LEXIS 21385 at *80 (S.D. Ohio 2000) ("an assignment which conveys the entire right, title and interest in an invention includes all alterations and improvements and all patents

whatsoever, issued and extensions."(internal citations omitted)).

Furthermore, the assignors specifically relinquished any right to "continuations and extensions." This language evidences an intent to include any future changes to or extensions of the patent application as part of the assignment. Defendants' argument, that Pilkington intended to retain the rights to any future CIPs, while assigning every other future interest or title stemming from the '394 application, as well as 39 other applications, is illogical and contrary to the language of the assignment. Although the assignment is unambiguous on its face and extrinsic evidence is not necessary, it is helpful to note that the Pilkington to Coburn assignment was executed pursuant to the sale of an entire Pilkington division. (Pl.'s Ex. C-1, Purchase Agreement at 1.) This belies any intent of Pilkington to retain any interest in a future CIP. The parties clearly intended that the assignment include any CIPs. Therefore, the omission of the term is not fatal to a Pilkington to Coburn assignment of the '350 application. Plaintiff may trace its title to the '771 patent this assignment.

### B. Coburn to J.P. Morgan Collateral Assignment

Also on March 9, 1992, Coburn executed a Patent Collateral Assignment to J.P. Morgan. Defendants argue that pursuant to this agreement, Coburn assigned all its rights in the future '350 application to J.P. Morgan, and J.P. Morgan still possesses these rights. The Patent Collateral Assignment does state: "assignor hereby grants, assigns and conveys to Lender the entire right, title, and interest of Assignor in and to the Patents." (Defs.' Ex. B, Patent Collateral Assignment ¶ 2.)

However, the assignment is clearly part of a loan agreement. It is titled "Patent Collateral Assignment" and states that "assignor has agreed to assign to Lender as collateral security certain patent rights." (Id.) As a general rule, "an assignment made as collateral security for a debt gives

-8-

the assignee only a qualified interest in the assigned chose, commensurate with the debt or liabilities secured," Applied Cos. v. U.S., 144 F.3d 1470, 1477 (3d. Cir. 1998), even if the assignment is written in absolute terms. Baker v. Rapport, 453 F.2d 1141, 1143 (1st Cir 1972) (citing United Pacific Insurance Company v. U.S., 358 F.2d 966 (Ct. Cl. 1966)); U.S. v. L. R. Foy Construction Company, 300 F.2d 207 (10th Cir. 1962). Furthermore, J.P. Morgan filed a UCC-1 form in Florida to record its security interest in the Patent rights. (Pl.'s Ex. C-5, Financing Statement.) A UCC-1 financing statement evidences liens on collateral for a debt and is not necessary if a party holds full ownership of a patent. (Id.) This statement is therefore evidence that the assignment transferred a mere collateral interest in, not full ownership of, the listed patents.

Furthermore, even if J.P. Morgan had full ownership of the patents at some point in the past, it is clear that all rights had been re-transferred to Coburn before commencement of this suit. Defendants' allegation that J.P. Morgan is the '771 patent owner to date is unconvincing. The collateral assignment states: "at such time as assignor shall completely satisfy all of the obligations and the Security Agreement terminates in accordance with Section 7.1 thereof, then this Assignment shall terminate and Lender, at Assignor's expense, shall execute and deliver to Assignor all deeds, assignments and other instruments as may be necessary or appropriate to re-vest in Assignor full title to the interest then held by Lender in the Patents." (Defs.' Ex. B, Patent Collateral Assignment ¶ 9.) Defendants argue that as Plaintiff has not produced documents evidencing the re-vesting of title, J.P. Morgan must still own all rights related the '771 patent. However, the Patent Collateral Assignment states only that such documents *may* be necessary. The use of "may" implies that deeds or assignments might not be necessary to re-transfer the

patents[2] and the clause merely records the party financially responsible should documentation be needed.  Therefore, this lack of documentation does not prove that J.P. Morgan maintains ownership of the '771 patent.

The Patent Collateral Assignment included a provision for its own termination: "at such time as assignor shall completely satisfy all of the Obligations and the Security Agreement terminates in accordance with Section 7.1 therefore, then this Assignment shall terminate." (Defs.' Ex. B, Patent Collateral Assignment ¶ 9.)  The security agreement, including the patent assignment, terminated by July 8, 1997.  On that date, J.P. Morgan filed an express termination of its interest in the patents in the state of Florida. (Pl.'s Ex. C-7, UCC-3.)  Plaintiff has shown that there were no outstanding UCC liens against Coburn at the time of the 1998 Gerber-Coburn merger, proving that the 1992 liens filed by  J.P. Morgan were no longer in effect. (Pl.'s Ex. C-9, Proof of No UCC filings in Florida, Oklahoma, Delaware.)  By July 8, 1997, Coburn had clearly satisfied its obligations and the Security Agreement, including the Patent Collateral Assignment, had terminated.  At termination of the Security Agreement, the collateralization of the patents was also terminated and Coburn's ownership of the patent rights was cleared of the security interest to which they had been subject.  Coburn's ownership was thereby restored in full.

Furthermore, J.P. Morgan has declared that it has no "right, title or interest in any collateral pledged by Coburn as part of the 1992 security agreement." (Pl.'s Ex. A, Farquhar Dec. ¶ 3).  J.P. Morgan "believes that any such right, title, or interest that it may have previously possessed terminated no later than July 8, 1997." (Id.)  Defendants' argument that the security

---

[2]Patents may change ownership by operation of law, see Akira Akazawa and Palm Crest, Inc. v. Link New Technology International, Inc., 520 F.3d 1254, 1356 (Fed. Cir. 2008), including by termination of a contract which states that patent rights re-vest with assignor at termination.

agreement did not terminate and J.P. Morgan possesses title to the '771 patent is unconvincing in the face of this testimony.  As J.P. Morgan itself has declared that it has no "right, title, or interest" in the patent, Defendants' argument becomes illogical and unfounded.  Defendants argument would leave the patent without an owner.

It is not necessary to address either party's arguments concerning *nunc pro tunc* assignments, as Plaintiff possessed title to the '771 patent at the time the suit commenced. Furthermore, it is unnecessary to address Defendants' arguments concerning the Inventors to Coburn Assignment, as Plaintiff's title is traced from the 1991 Inventors to Pilkington assignment.  The additional assignment only further evidences the intent of all parties that Coburn own full title to the '771 patent.

The Court hereby finds that as owner of the '771 patent, Plaintiff has standing to sue. The Court thereby has jurisdiction over this action.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss to [Doc. No. 88] in **denied.**

SO ORDERED.

Dated at New Haven, Connecticut, this  2<u>nd</u>  day of September, 2009.

_____
/s/
Peter C. Dorsey
U.S. District Judge
